**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| Ashley Bush | ) | |
| 29 Brassie Court | ) | |
| Montgomery Village, MD 20886 | ) | |
| | ) | |
|     Plaintiff, | ) | Civil Action No.: 21-1190 |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | |
| Frederick County Public Schools | ) | |
| 191 South East Street | ) | |
| Frederick, MD 21701 | ) | JURY TRIAL DEMANDED |
| | ) | |
| SERVE: | ) | |
| Theresa Alban, Superintendent | ) | |
| Jonathan "Jay" Mason, President | ) | |
| Frederick County Board of Education | ) | |
| 191 South East Street | ) | |
| Frederick, MD 21702 | ) | |
| | ) | |
|     Defendant. | ) | |
| _____ | ) | |

## COMPLAINT

**COMES NOW**, Plaintiff Ashley Bush ("Ms. Bush"), by the undersigned counsel, and

complains of Defendant Frederick County Public Schools ("FCPS"), as follows:

### INTRODUCTION

1.  This is an action authorized and instituted pursuant to Title VII of the Civil Rights Act of
    1964, 42 U.S.C. § 2000 et seq. ("Title VII") and the Civil Rights Act of 1866, Section
    1981(a)("Section 1981"), for the Defendant's discrimination based upon her race (African
    American), and sex/gender (Female), and in retaliation against Plaintiff for her statutorily-
    protected activity.

2. Additionally, Plaintiff brings this case for her breach of contract to recover damages as a result of her unlawful and discriminatorily-based dismissal from her position as Head Coach of the Girls Basketball Team at Frederick High School, within the Frederick County Public School system located in Frederick, Maryland.

## JURISDICTION AND VENUE

3. This Honorable Court has subject matter jurisdiction over this suit pursuant to 28 U.S.C. §§ 1331 as it asserts a claim that arises under the Constitution, laws or treaties of the United States, specifically Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq*., and Section 1981, to redress and enjoin the employment practices of the Defendant.

4. This Honorable Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1343.

5. This Court has subject matter jurisdiction over this suit pursuant to 42U.S.C.§ 2000e-16(a) and (c), incorporating 42 U.S.C. § 2000e-5(f) (3).

6. Venue is proper pursuant to 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e-5(f)(3), because the events and business records that give rise to the issues in this Complaint occurred in this District.

## THE PARTIES

7. Plaintiff, Ashley Bush, is an adult resident and domiciliary of the State of Maryland. In addition to being an educator, Ms. Bush has a personal interest in philanthropy and providing for her local community as a mentor and advisor for young adults.

8.  Defendant, Frederick County Public Schools, promotes itself as being a diverse and welcoming body, with a goal that they will "hire, **support**, and **retain** staff who champion individual, professional, and student excellence."[1]

9.  Defendant has its principal place of business and domicile in the State of Maryland.

## EXHAUSTION OF REMEDIES

10. Plaintiff has exhausted all of her administrative remedies.

11. Plaintiff filed a charge with the Baltimore Field Office of the U.S. Equal Employment Opportunity Commission ("EEOC") alleging discrimination based on race (African American), sex (female), and retaliation (prior statutorily protected activity).

12. The EEOC issued Plaintiff a Right-to-Sue Letter dated February 24, 2021, informing her that she has ninety (90) days upon receipt of the Notice, to file suit in the appropriate court.

13. Plaintiff received the Right-to-Sue letter on February 27, 2021. Accordingly, Plaintiff timely files this action in accordance with the Notice of Rights, which provided Plaintiff the right to file this Complaint within 90 days of receipt of the Notice.

## NATURE OF THE ACTION

14. Plaintiff brings this action to recover all legal and equitable remedies available for Defendant's discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e ("Title VII"), including back pay, front pay, and compensatory damages in an amount to be determined by the jury that would fully compensate her for the economic loss, physical and psychological injury, humiliation, embarrassment, and mental and emotional distress, prejudgment interest, attorneys' fees, expenses, and costs of the action.

---

[1] https://www.fcps.org/boe/strategic-plan.

15. Plaintiff's damages are significant, including, but not limited to, the loss of reputation, career advantage, emotional tranquility and denial of her constitutional and statutory rights.

## FACTS COMMON TO ALL COUNTS

16. Plaintiff held her position as Head Coach of the Girls Basketball Team for Frederick High School since May 2015.

17. Plaintiff has been a successful and devoted Coach to these young athletes and has achieved stellar results, including an impressive number of 120 total wins and three Maryland State Championships.

18. Over time, as Defendant became more of an outspoken advocate against racism, discrimination, and the prejudicial treatment of she and her students, the Defendant seemingly became strategically focused on ousting Plaintiff from her position, which resulted in  various allegations lodged against her over the course of her career in pursuit of that objective.

19. Plaintiff was regularly subjected to discriminatory and racist behavior as a result of Defendant's inability to implement anti-racist policies for their employees and students of color, more specifically African Americans. For example, basketball game fans and attendees would refer to the Plaintiff and her African American players as "gorillas" and would make monkey gestures toward them. Defendant was aware of these types of behaviors occurring at games and took no action to address it, quell it, or alleviate it in order to protect the coaching staff and students' physical and social emotional health, which are inclusive of the Defendant's responsibilities.

20. To provide more context, on or about January 19, 2018, Plaintiff attended an away game at Linganore High School with her players. Linganore is a predominantly Caucasian school

in a predominantly Caucasian residential community, which has a history of racist behaviors at athletic events. See Exhibits 1, 2. The energy in the gymnasium was unwelcoming and threatening towards Plaintiff and her players. During the game, officials made several prejudicial calls against the team that inevitably had a negative impact on the players. At one point, Plaintiff had to assist a player with putting her goggles back on because she was shaking out of discomfort and nervousness of the environment. After the game concluded, the spectators, parents of students, and coaching staff of Linganore High School began chanting obscene and racial comments at Plaintiff and her players. When Plaintiff's Assistant Coach sought assistance from the on-duty Resource Officer concerning the threatening and harassing conduct they were experiencing, she was told that nothing could be done. Defendant was aware of this incident, yet it became apparent that the Defendant had no intention of conducting an investigation or pursuing any recourse to address this traumatic experience for its employees, students, or accompanying staff.

21. Following this incident, Plaintiff attended several meetings with Frederick High School's Athletic Director, Principal, Supervisor of Athletics for FCPS, and the Director of High Schools for FCPS. Plaintiff believed that the meetings' objectives were to address the incident at Linganore High School and to review the individual statements that the student-athletes made regarding the treatment, conduct, and statements made to and against them at the game. However, what resulted was the Plaintiff being questioned about *her* conduct at the game, which included an egregious and baseless accusation that she punched the Linganore head coach—which was completely untrue.

22. Then, on or about January 26, 2018, Plaintiff and Defendant attended a meeting for all Athletic Directors and Varsity Coaches to supposedly address the Linganore High School

incident. The meeting was called by Dr. Theresa R. Alban of FCPS. However, Dr. Alban spent the majority of the meeting detailing an incident in which a homosexual student was being discriminated against by their teacher for their sexual orientation. Rather than address the incident that necessitated the meeting, Dr. Alban obfuscated its purpose and refused to address the systemic racial issues that pervade FCPS. This further caused a divide between Plaintiff and Defendant as the Plaintiff began to see that the Defendant had no desire to address their prejudicial system and were also unwilling to remedy its effects.

23. On or about February 21, 2018, Plaintiff and Defendant attended a mandatory meeting to discuss coaching expectations for the upcoming playoff game. Defendant reviewed the FCPS "Pillars of Character" standard with the Plaintiff and communicated their safety expectations going forward, which effectively placed the blame of what occurred at Linganore High School, on the Plaintiff. Defendant further implied that the incident occurred because there was "blame on both sides," or words similar, rather than acknowledging that the conduct originated from the Linganore students, parents, community members, and Coaching staff. In response to Plaintiff's persisting for a consequence to be implemented against Linganore for the actions that were initiated from that School community, Dr. Michael Markoe said, "if you keep looking in the rearview mirror, you are bound to get into an accident," or words similar. Plaintiff was completely flabbergasted by this response. Defendant was aware of the inappropriateness of the meeting, which was reflected when the then-Principal of Frederick High School, Kathy Campagnoli, later apologized to Plaintiff for Dr. Markoe's comment and the overall tone of the meeting.

24. Following the February 21, 2018 meeting, Defendant attempted to offer resolutions in response to the Linganore High School game to be implemented for future athletic events. However, the proposed solutions did not address the central issue that FCPS enables and supports, and does not actively work to dismantle racist behaviors, structures, or policies. Their suggested proposals included moving the next game against Linganore to a neutral location, implementing a sportsmanship announcement to be played before any game, and installing cameras in all high schools. These solutions do not address the issue of systemic racism and prejudice that pervades FCPS, and instead are futile bandages that the Defendant hopes will be perceived as actual change.

25. On or about March 10, 2018, Plaintiff had successfully led her team to their second consecutive Maryland State Championship and won the title for Frederick High School.

26. On or about March 12, 2018, two days after winning the State Title, Plaintiff was informed that she must complete a behavior modification evaluation with Frederick High School Principal Kathy Campagnoli. Principal Campagnoli informed Plaintiff that Defendant was requiring Principal Campagnoli to have a meeting with Plaintiff on how she could have more appropriately reacted to the events that occurred during the Linganore High School incident. Plaintiff was then randomly quizzed and asked to respond to hypothetical scenarios in an effort to debase, belittle, and dehumanize her. After Plaintiff objected to this treatment, Principal Campagnoli apologized to Plaintiff and indicated that she was aware of the inappropriateness of the meeting and questions. Principal Campagnoli informed Plaintiff that she would fill in the responses on her behalf as to prevent any further trauma and embarrassment to her. Several months later, Principal Campagnoli announced her retirement and informed Plaintiff that a contributing factor to her decision to retire was

due to the Defendant's treatment of Plaintiff and her own student athletes during the entirety of Plaintiff's time at Frederick High School.

27. On or about April 20, 2018, Plaintiff attended a meeting with the then Principal of Frederick High School, Kathy Campagnoli. This meeting's purpose was to address the mandatory FCPS coach evaluation that Plaintiff was instructed to complete. Plaintiff was under the impression that this evaluation was a requirement for the coaches of Frederick and Linganore High Schools in response to the previous incident between the two schools. However, when Plaintiff questioned the Linganore High School Coach, Rachel Easterday, about whether she had also to complete it, she was informed that she did not have to complete this evaluation. At this point, Plaintiff understood that she was being treated differently.

28. Before the beginning of the 2018-2019 season, Plaintiff was invited to participate in a meeting with the Linganore High School Head Coach to discuss last season's incident. Finding this request to be futile since the Plaintiff did not commit any violation or engage in any appropriate conduct, she politely declined. Plaintiff felt that this was yet another bandaged response to the systemic racial problem that pervade FCPS, which the Defendant refused to adequately address. As a result of her refusal, the FCPS Supervisor of Athletics, Kevin Kendro, demanded that Plaintiff attend this meeting and threatened that she would not be permitted to coach the next season if she did not. In an effort to not abandon her players who needed an advocate, Plaintiff reluctantly accepted the invitation. Plaintiff learned that she was the only Coach facing this type of scrutiny, pressure, and threats.

29. Plaintiff attended the mandated meeting with the Linganore High School coach which was held at the FCPS Central Office. During this meeting, Plaintiff informed Linganore Head

Coach, Rachel Easterday, about the unbalanced response that she has received regarding the altercation last season. Plaintiff also informed Ms. Easterday that one of Plaintiff's players reported that Ms. Easterday was yelling obscenities at her during the altercation. Ms. Easterday did not deny this accusation but responded that she wished she had an opportunity to respond. Plaintiff became frustrated as this was further evidence that Ms. Easterday was not subjected to the same scrutiny and criticism as the Plaintiff, even though Ms. Easterday and her team's fans and parents were the aggressors. When Ms. Easterday questioned Mr. Kendro about the reasoning behind this differential treatment, Mr. Kendro abruptly ended the meeting. As the parties departed the Central Office, Plaintiff and Ms. Easterday had a brief exchange in which Ms. Easterday informed Plaintiff that she was completely unaware of Defendant's response to the incident, of their treatment of Plaintiff, and their enforced requirement that Plaintiff attend behavioral meetings and evaluations. Ms. Easterday further elaborated that she was not subjected to these meetings or evaluations and was shocked to hear about these developments.

30. On January 31, 2018, Plaintiff sent an email voicing her concerns regarding a podcast that featured FCPS Superintendent Dr. Theresa Alban, during which Dr. Alban defended the Linganore students' behaviors at the previous season's incident. Further, the podcast highlighted the fact that Defendant was aware that racial slurs and epithets were spoken to the Frederick High School players, was aware of some of the individuals that made the comments, and that the Defendant did not reprimand these individuals. The email that the Plaintiff sent highlighted these issues and included her personal feelings about the incident as a direct victim of these assaults. Instead of properly responding to the Plaintiff's concerns, the Defendant threatened her with insubordination. In addition, the Defendant

sent crisis counselors to Linganore High School to assist the student perpetrators who felt victimized by this incident. Conversely, the Frederick High School players who had been unfairly subjected to the inappropriate and hurtful racial slurs and epithets were not afforded access to crisis counselors by the Defendant and thus were denied structures to support their social and emotional health unlike the support offered to Linganore High School students.

31. On or about January 15, 2019, Plaintiff and her players had a basketball game against Walkersville High School. During the game, the Walkersville team kept fouling the FHS team in an effort to stop the clock and regain possession of the ball so that they could shorten the score gap. The officials witnessed the repeated fouls and did not call them. At one point, a Walkersville player aggressively pushed one of the Frederick High School players to the ground and the foul was finally called. However, the officials approached the fouled FHS player and accused her of being the aggressor. The officials then call a common foul, which is an infraction that violates the rules of the game. Plaintiff attempts to make a plea for her player, for an elevated flagrant foul due to the harsh nature of contact, to no avail. Plaintiff then questioned the reasoning behind all three (3) officials approaching her player as though she were the aggressor, instead of addressing the other player who actually caused the foul. In response to this inquiry, the official (White, male) made a formal complaint against the Plaintiff claiming that Plaintiff made him "feel uncomfortable" because she implied that he is racist.

32. Plaintiff made a video statement in response to the officials filing a formal complaint against her and sent the statement to the officials' supervisor, Bill Davis, and FHS Principal, David Franceschina. Plaintiff then attended a meeting with Mr. Franceschina to

discuss this incident in further detail. Mr. Franceschina attempted to portray sympathy towards the Plaintiff and even stated that he was an ally to the African American community. However, he concluded that meeting by issuing a Letter of Reprimand to the Plaintiff which condemned her for the actions she took at the game.

33. On or about April 15, 2019, Plaintiff was accused of posting a statement on Facebook regarding the selection of two athletes for the Co-Player of the Year award. The post contained criticism about the selection of the two athletes chosen for this award. One of the athletes selected was a player that the Plaintiff coached, and the other player was a student at Middletown High School. The Facebook post expressed disappointment over this selection as the Frederick High School player had more impressive statistics and accomplishments and the player's achievements were being dimmed by having to share an award with someone who had not reached the same level of success. The Defendant believed that these opinions were that of the Plaintiff due to the first-person perspective and use of the word "I." The Defendant interpreted this post as hate speech. The Middletown High School community was inflamed by this post and demanded repercussions for the Plaintiff even though it did not violate any school or Facebook policies, was not posted on the official team page, and did not include any threatening or targeting language.

34. Plaintiff attended a meeting with Frederick High School principal David Franceshina following the initial reactions to the post. Mr. Franceshina requested that the Plaintiff remove the post, even though at the time he was unsure of the poster's identity. At no time did the Plaintiff admit to authoring the Facebook post, but instead the Plaintiff pleaded with Mr. Franceshina to not focus on the post but rather evaluate and empathize with how the

players have felt during the entire season. Plaintiff highlighted how the players on the team regularly get overlooked for their accomplishments, are blamed for incidents that did not originate with them and are consistent victims of racially based microaggressions and violence. Mr. Franceshina had no responses to Plaintiff's pleas, and instead asked the Athletic Director to order Plaintiff to take the post down.

35. On or about April 23, 2019, Plaintiff was once again implored to remove the Facebook post even though he was not certain that she was the author. The next day, April 24, 2019, Mr. Franceschina emailed Plaintiff with an order to remove the post by a certain deadline or else she would be charged with insubordination, again without any evidence or knowledge that she was the author. Through this action it is clear that Defendant pressured Mr. Franceschina to apply as much pressure as necessary to make the Plaintiff responsible for this post.

36. On or about June 4, 2019, Plaintiff attended a meeting with Mr. Franceschina, FHS Athletic Director, and FHS Assistant Principal, Aaron Phillips. The purpose of the meeting was to inform Plaintiff that she would be suspended for the first game of the 2019 – 2020 season for insubordination related to the Facebook post. Plaintiff questioned this decision since the post was deleted prior to the deadline provided by Mr. Franceschina.  Mr. Franceschina replied that Plaintiff had taken too long to take the post down and was now being charged with insubordination. Plaintiff attempted to appeal the suspension to Defendant, particularly in light of the face that the Middletown High School coach had published a similar post on Facebook without any consequence. However, Plaintiff's appeals were dismissed.

37. Mr. Franceshina approached Plaintiff and asked if meeting with FCPS's Accelerating the Achievement and Equity Executive Director, Dr. Keith Harris, would assist in her accepting the suspension. Plaintiff replied that she was not interested in meeting with Dr. Harris because she did not feel this meeting would provide any tangible, progressive resolutions and also felt that Mr. Franceschina was attempting to pacify Plaintiff by suggesting she meet with an African American employee to voice her concerns. Mr. Franceschina then demanded that Plaintiff meet with Dr. Harris, and relayed that if she refused, she would not be coaching the team the following year. This is the second documented attempt to threaten and harass the Plaintiff into complying with a process that she was disinclined to participate in during her employment with FCPS. For the sake of the players, Plaintiff reluctantly complied with this demand.

38. Around June/July 2019, Plaintiff attended a meeting with Dr. Harris and Athletic Director Keivette Hammond. Plaintiff informed Dr. Harris that she did not feel comfortable participating in this meeting because she was forced. Dr. Harris attempted to appeal to Plaintiff by stating that she should not think of him as a FCPS employee, but rather as another member of the Black community. However, when Plaintiff began to explain her grievances, Dr. Harris immediately countered her statements, gaslit her, and stated that she deserved the consequences she was issued because she was insubordinate. Plaintiff highlighted the fact that these statements demonstrate to her that he is only attending the meeting as a FCPS employee and not as someone who wants to advocate for FCPS students and staff members who are being subjected to discriminatory and racist practices. Dr. Harris asked Plaintiff what he could do to gain her trust and demonstrate that he does want to help improve things for her and her team. Plaintiff and Mrs. Hammond provided those

13

requests to Dr. Harris. However, Dr. Harris never contacted Plaintiff or Mrs. Hammond again regarding their requests.

39. Plaintiff attempted to advocate for her players on multiple occasions, specifically addressing the lack of value and support they receive from the administration. Defendant reprimanded Plaintiff for making such inquiries and accusations yet permitted similar comments from a White coach to stand.

40. On or about February 4, 2020, Plaintiff informed one of her players that she was wearing the incorrect travel uniform for the game that evening. After the game, Plaintiff addressed the entire team as a whole regarding the uniform policy.

41. On or about February 5, 2020, Plaintiff received texts from two parents of players that notified her of their concerns over their children's grievances with the team. Plaintiff responded to each parent individually, assuring them that she would address each player's concerns and would work with each player to find a solution.

42. On or about February 5, 2020, Plaintiff arrived for the afternoon practice session and was informed by another player that three senior players had resigned from the team. Plaintiff was caught off-guard by this news and immediately held a team meeting to address the situation.

43. During this team meeting, Plaintiff encouraged the players to speak openly and honestly about their feelings and discussed their concerns for how to handle the backlash from the media and community inquiries. The players reiterated that they wanted to remain on the team and accomplish the goals they established at the beginning of the season.

44. Plaintiff then shared her own personal experiences with the sport in order to be more relatable and understanding to the players as an African American woman coaching a

mostly African American team. Some of these personal experiences included anecdotes of Plaintiff's first-hand knowledge and familiarity with systemic discrimination within the sport and educational system.

45. Plaintiff concluded the meeting with a final activity titled, "Protect Your Environment Circle Activity" which is meant to foster camaraderie and friendship amongst teammates. The meeting concluded and the team returned to their normal practice schedule.

46. On or about February 6, 2020, Defendant invited Plaintiff to a meeting to discuss several topics, including the team policy for travel gear, the "Protect Your Environment" activity, college recruiting process, poor leadership accusations, and issues with the senior players. Defendant then inquired about Plaintiff's knowledge of accusations regarding emotional abuse/treatment of the senior players, physical abuse of one player, and the three senior players resignations. Plaintiff replied that she was unaware of these allegations. Defendant informed Plaintiff they would then conduct an investigation. Plaintiff requested if the Defendant could disclose every allegation lodged against her, but the Defendant declined.

47. On or about February 6, 2020 two additional sibling players resigned from the team at the afternoon practice. Plaintiff attempted to contact the players and their parents to discuss the decision further but was unable to reach them.

48. Plaintiff was regularly dismissed or reprimanded whenever she addressed or questioned racially insensitive behavior that occurred on school grounds, while White male employees were taken seriously regarding their complaints.

49. For instance, on or about February 10, 2020, a history teacher at Governor Thomas Johnson High displayed a Nazi flag with a swastika in his classroom window that was visible to all spectators at the boys' basketball game between Thomas Johnson High School and

Frederick High School. Exh. 3. Defendant claimed that an investigation into this incident was underway; however, there has been no update or communication about its findings. *See*, Exh. 3.

50. On or about February 12, 2020, Plaintiff and Defendant attended a follow up meeting to the one held on February 6, 2020. Defendant informed Plaintiff that they concluded their investigation and that they had found no substantiation to the abuse allegations. Plaintiff was permitted to continue coaching. Plaintiff verbalized to Defendant that the parents who made the unsubstantiated allegations were "out to get" Plaintiff and "would not stop with the allegations." Plaintiff asked Defendant how she would be protected as an FCPS employee. Defendant informed Plaintiff they would protect the Plaintiff. Defendant then informed the parents of the players of their investigative results. The parents then made an additional accusation.

51. On or about February 13, 2020, a false Facebook profile under the alias "Melanie Smith" posted a recording that they purported was recorded during the most recent team meeting held by Plaintiff. The recording captures an adult woman stating "fuck white people." The post on the Facebook page implies that the Plaintiff made this statement. The audio recording was then sent to the Defendant.

52. On or about February 14, 2020, Plaintiff attended a meeting with Defendant to address the audio recording. Defendant asked Plaintiff if she had made that statement, to which Plaintiff replied, "I don't recall." Defendant then played the recording for Plaintiff. Defendant informed Plaintiff that those types of statements are considered hate speech and that they have no choice but to suspend Plaintiff. Plaintiff then informed Defendant that if that were her voice, then the recording was obtained illegally, and she will move forward

with legal action if it is used against her professionally. Defendant then replied, "that is why we are not moving with haste." Plaintiff then respectfully honored Defendant's duty to suspend her pending an investigation and turned in her keys and badge.

53. On or about February 15, 2020, Plaintiff sent Defendant an email suggesting that it would be in the best interest of the students and players of the team if Plaintiff could remain as the Head Coach for the remainder of the year. After that point, Plaintiff offered to resign quietly and without incident. Plaintiff emphasized that many of these players admire her as a mentor and leader and she feels it would be in their disfavor to remove her so late into the season. Based on knowledge and belief, Plaintiff did not receive a response to this letter.

54. On or about February 17, 2020, Plaintiff attended a termination meeting that included the Principal, Athletic Director, Assistant Principals, Plaintiff, and Plaintiff's Counsel. Before the meeting began, Plaintiff informed the Principal that she would need to phone-in her counsel, to which the principal responded with agitation and replied that if that were the case then the meeting would need to be recorded. After taking a moment to have Plaintiff confer with counsel, the Principal then re-entered the room and stated that the meeting did not need to be recorded after all. The Principal then issued the termination letter. During her review, the Plaintiff found a discrepancy and highlighted it for the attendees. Plaintiff then inquired about the reasoning behind why she is not permitted to attend basketball games, and the Principal replied that it was his expectation that she should not be in attendance. Plaintiff then inquired about the appeals process to this decision and the Principal informed her that she has the right to an appeal. Plaintiff signed the letter as an acknowledgement of receipt.

## COUNT I

**Race Discrimination in Violation of Title VII of the Civil Rights Act of 1964**

55. Plaintiff realleges and incorporates by reference each of the preceding paragraphs as if fully set forth herein.

56. A *prima facie* case of race discrimination requires a showing of four (4) elements: (1) she is a member of a protected class; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) the action occurred under circumstances giving rise to an inference of discrimination.

57. Md. State Government ("S.G.") Code Ann. § 20-606 and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*., prohibit discrimination against employees on the basis of sex, race, as well as retaliation, as relevant here. *See* 42 U.S.C. § 2000e-2(a); 42 U.S.C. § 2000e-3(a)(1994)"). Due to the similarity between state and federal law, Maryland courts usually defer to the "federal criteria and seek guidance from Federal Title VII decisions in determining a violation of the analogous State and county provisions." *Muse-Ariyoh v. Board of Education*, 235, 242 (Md. App. 2017).

58. Plaintiff is an African American woman and is considered a member of a protected class as stipulated under Title VII of the Civil Rights Act of 1964.

59. Plaintiff is a qualified instructor and coach for adolescent athletes, having obtained several certifications and over ten (10) years of experience in coaching young athletes.

60. Plaintiff suffered an adverse employment action directly related to her position of being a protected class member as recognized under Title VII of the Civil Rights Act of 1964.

61. Plaintiff was accused of making the comment "fuck white people" that was allegedly captured on an illegally recorded audio recording of a discussion she was supposedly

having with her basketball team. Although there was no authentication of the audio, no consent to the recording of any of her conversations or meetings she had with her basketball team, and the Plaintiff was initially advised that the recording was provided anonymously, the Defendant held Plaintiff responsible and used this as the basis for her adverse personnel action.

62. Defendants have a history of disparately treating African American employees with greater scrutiny and reprimand than that of White employees.

63. Plaintiff was dismissed for allegedly making a statement that was considered hate speech, while a White, male history teacher at a school in the same school system displayed a Nazi flag on his classroom window and was not dismissed for such action.

64. The difference in treatment sufficiently demonstrates that the adverse employment action received by the Plaintiff gives an inference of race discrimination and prejudice.

65. Plaintiff has suffered significant emotional, physical, and financial distress as a result of the unlawful actions and conduct of the Defendant.

**WHEREFORE**, Plaintiff respectfully requests that the Court GRANT an award of compensatory damages against Defendant that exceeds $500,000, specific performance, and award such other and further relief deemed fair and just.

## COUNT II

### Sex Discrimination in Violation of Title VII of the Civil Rights Act of 1964

66. Plaintiff realleges and incorporates by reference each of the preceding paragraphs as if fully set forth herein.

67. A *prima facie* case of sex discrimination requires a showing of four (4) elements: (1.) she is a member of a protected class; (2.) she was qualified for the position; (3.) she suffered

an adverse employment action; and (4.) the action occurred under circumstances giving rise to an inference of discrimination.

68. Md. State Government ("S.G.") Code Ann. § 20-606 and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*., prohibit discrimination against employees on the basis of sex, race, as well as retaliation, as relevant here. *See* 42 U.S.C. § 2000e-2(a); 42 U.S.C. § 2000e-3(a)(1994)"). Due to the similarity between state and federal law, Maryland courts usually defer to the "federal criteria and seek guidance from Federal Title VII decisions in determining a violation of the analogous State and county provisions." *Muse-Ariyoh v. Board of Education*, 235, 242 (Md. App. 2017).

69. Plaintiff is an African American woman and is considered a member of a protected class as stipulated under Title VII of the Civil Rights Act of 1964.

70. Plaintiff is a qualified instructor and coach for adolescent athletes, having obtained several certifications and over ten years of experience in coaching young athletes.

71. Plaintiff suffered an adverse employment action directly related to her position of being a protected class member as recognized under Title VII of the Civil Rights Act of 1964.

72. Plaintiff was presumed to have made the comment "fuck white people" that was captured on an illegally obtained audio recording, although there was no evidence that it was her voice nor were there witnesses of the event in which this allegedly took place.

73. Defendants have a history of disparately treating female employees with greater scrutiny and reprimand than that of male employees.

74. Plaintiff was dismissed for allegedly making a statement that was considered hate speech, while a White, male history teacher at a school in the same school system displayed a Nazi flag on his classroom window and was not reprimanded for such action.

75. The difference in treatment sufficiently demonstrates that the adverse employment action received by the Plaintiff gives an inference of sex discrimination and prejudice.

76. Plaintiff has suffered significant emotional, physical, and financial distress as a result of the unlawful actions and conduct of the Defendant.

77. Plaintiff realleges and incorporates by reference each of the preceding paragraphs as if fully set forth herein.

**WHEREFORE**, Plaintiff respectfully requests that the Court GRANT an award of compensatory damages against Defendant that exceeds $500,000, specific performance, and award such other and further relief deemed fair and just.

## COUNT III

### Breach of Written Employment Agreement

78. To prevail in an action for breach of any contract—including an employment contract—a plaintiff must prove "that the defendant owed the plaintiff a contractual obligation and that the defendant breached that obligation." *Harig v. Progress Rail Servs. Corp.*, 166 F. Supp. 3d 542, 550, 2015 U.S. Dist. LEXIS 169896, *14. *See also Taylor v. NationsBank, N.A.*, 365 Md. 166, 776 A.2d 645, 651 (Md. 2001).

79. Plaintiff and Defendant memorialized an employment agreement on September 26, 2019.

80. Plaintiff maintained and fulfilled all of her obligations and responsibilities as outlined in the employment agreement.

81. Plaintiff did not at any point during her employment with Frederick High School violate any section stipulated in the at-will employment agreement.

82. The employment agreement stipulated that the Frederick County Board of Education and Frederick County Public Schools policies would be the governing body of the employment agreement.

83. The Frederick County Board of Education and Frederick County Public Schools policies specifically prohibit discrimination and harassment in any form (BOE Policy 309).

84. In participating in both discriminatory and harassing behavior, Defendants have violated their own policies that govern the provisions of the employment agreement, thereby breaching material elements of the agreement.

85. Defendant's unlawful conduct has caused the Plaintiff to suffer substantial emotional, physical, and financial distress.

86. Plaintiff realleges and incorporates by reference each of the preceding paragraphs as if fully set forth herein.

87. Employment agreements in Maryland are presumptively at-will. However, a contract may "overcome that presumption and create an employment relationship whereby the employee may be terminated only for just cause." *Harig v. Progress Rail Servs. Corp*., 166 F. Supp. 3d 542, 550, 2015 U.S. Dist. LEXIS 169896, *14. *See also Towson Univ. v. Conte*, 384 Md. 68, 862 A.2d 941, 947 (Md. 2004).

88. Plaintiff did not violate any section stipulated in the at-will employment agreement.

89. Defendant dismissed Plaintiff from her position based upon an unverified conclusion that it was her voice captured on a recorded statement that constituted "hate speech," which is prohibited under the Board of Education and Frederick County Public Schools policies that govern employment agreement.

90. Defendant claimed that they would conduct a thorough and meticulous investigation into the source of the recording during the time that Plaintiff was suspended from her position.

91. Defendant did not conduct a thorough and meticulous investigation, but rather made an arbitrary and capricious finding that it was indeed the Plaintiff's voice captured on the recording.

92. Defendant has a documented history of making baseless accusations against Plaintiff, including but not limited to allegations of emotional and physical abuse of players, in an effort to substantiate a valid dismissal.

93. Defendant's decision to terminate Plaintiff is directly related to Plaintiff's pushback of prejudicial policies that disparately impact African Americans.

94. Defendant's decision to terminate Plaintiff is against the public policy foundations of an at-will agreement as the dismissal was in direct response to Plaintiff vocalizing the systemic, discriminatory, and prejudicial treatment of the Frederick County Public School System.

95. Defendant's unlawful conduct has caused the Plaintiff to suffer substantial emotional, physical, and financial distress.

**WHEREFORE**, Plaintiff respectfully requests that the Court GRANT an award of compensatory damages against Defendant that exceeds $500,000, specific performance, and award such other and further relief deemed fair and just.

## COUNT IV

### Wrongful Termination

96. Plaintiff realleges and incorporates by reference each of the preceding paragraphs as if fully set forth herein.

97. Employment agreements in Maryland are presumptively at-will. However, a contract may "overcome that presumption and create an employment relationship whereby the employee may be terminated only for just cause." *Harig v. Progress Rail Servs. Corp.*, 166 F. Supp. 3d 542, 550, 2015 U.S. Dist. LEXIS 169896, *14. *See also Towson Univ. v. Conte*, 384 Md. 68, 862 A.2d 941, 947 (Md. 2004).

98. Plaintiff and Defendant acquiesced and memorialized an at-will employment agreement on September 26, 2019.

99. Plaintiff maintained and fulfilled all of her obligations and responsibilities as outlined in the employment agreement.

100.     Plaintiff did not at any point during her employment with Frederick High School violate any section stipulated in the at-will employment agreement.

101.     Defendant dismissed Plaintiff from her position based upon an arbitrary conclusion that it was her voice captured on a recorded statement that constituted "hate speech" which is prohibited under the Board of Education and Frederick County Public Schools policies that govern employment agreement.

102.     Defendant claimed that they would conduct a thorough and meticulous investigation into the source of the recording during the time that Plaintiff was suspended from her position.

103.     Defendant did not conduct a thorough and meticulous investigation, but rather made an arbitrary and capricious finding that it was indeed the Plaintiff's voice captured on the recording.

104.     Defendant has a documented history of making baseless accusations against Plaintiff, including but not limited to allegations of emotional and physical abuse of players, in an effort to substantiate a valid dismissal.

105.     Defendant's decision to terminate Plaintiff is directly related to Plaintiff's pushback of prejudicial policies that disparately impact African Americans.

106.     Defendant's decision to terminate Plaintiff is against the public policy foundations of an at-will agreement as the dismissal was in direct response to Plaintiff vocalizing the systemic and prejudicial treatment of the Frederick County Public School System.

107.     Defendant's unlawful conduct has caused the Plaintiff to suffer substantial emotional, physical, and financial distress.

**WHEREFORE**, Plaintiff respectfully requests that the Court GRANT an award of compensatory damages against Defendant that exceeds $500,000, specific performance, and award such other and further relief deemed fair and just.

### COUNT V

### Violation of Maryland's Wiretap Statute

108.     Plaintiff realleges and incorporates by reference each of the preceding paragraphs as if fully set forth herein.

109.     Maryland's Wiretapping and Electronic Surveillance Act generally prohibits the willful interception, disclosure, and use of impermissibly intercepted communications. Md. Code Ann., Cts. & Jud. Proc. § 10-402(a).

110.     Under the Act, oral communication is defined as "any conversation or words spoken to or by any person in private conversation." Md. Code Ann., Cts. & Jud. Proc. § 10-401(13)(i).

111.     Plaintiff maintains that she does not recall making the statements as captured on the recording.

112.     If it is determined to be the Plaintiff's voice on the recording, then it shall be found to be an unlawful capture in direct violation of Maryland's Wiretap Statute.

113.     If it is determined to be the Plaintiff's voice on the recording, the Plaintiff maintains that she did not provide consent to be recorded as is required under the Maryland Wiretap Statute.

114.     If it is determined to be the Plaintiff's voice on the recording, the disclosure of the recording is unlawful as it was captured without the Plaintiff's full and knowledgeable consent.

115.     If it is determined to be the Plaintiff's voice on the recording, the distribution of the recording is unlawful and prohibited since it was captured without the Plaintiff's full and knowledgeable consent.

116.     If it is determined to be the Plaintiff's voice on the recording, its use as the basis for Plaintiff's termination from her position is unlawful as it was captured illegally and without the prior full consent of the Plaintiff.

117.     Defendants' use of this recording has caused Plaintiff significant emotional, physical, and financial distress.

## COUNT VI

### Defamation

118.     Plaintiff realleges and incorporates by reference each of the preceding paragraphs as if fully set forth herein.

119.     Under Maryland law, to present a *prima facie* case of defamation, a plaintiff must establish four elements: (1.) that the defendant made a defamatory statement to a third person, (2.) that the statement was false, (3.) that the defendant was legally at fault in making the statement, and (4.) that the plaintiff thereby suffered harm. *Smith v. Danielczyk,* 400 Md. 98, 115, 928 A.2d 795, 805 (2007).

120.     A defamatory statement is one "which tends to expose a person to public scorn, hatred, contempt or ridicule, thereby discouraging others in the community from having a good opinion of, or associating with, that person." *Gohari v. Darvish,* 363 Md. 42, 55, 767 A.2d 321, 327 (2001) (quoting *Rosenberg v. Helinski,* 328 Md. 664, 675, 616 A.2d 866, 871 (1992)).

121.     The statement "fuck white people" is considered defamatory as it discourages others in the community from having a good opinion of or desire to associate with the Plaintiff as they have the false belief that the Plaintiff made these comments.

122.     Defendant failed to authenticate or verify the identity of the voice on the recording, thereby acting with reckless disregard and actual malice when disclosing it as a fact that it was the Plaintiff's voice.

123.     Defendant's disclosure and distribution of the audio recording that they purport captured the Plaintiff making a statement that constituted hate speech signifies that they made a defamatory and false statement to a third party.

124.     The Defendant is at fault for making this statement due to the fact that they had not authenticated the recording at the time of the third-party disclosure.

125.     The Defendant is at fault for making this statement due to the fact that they had not corroborated the identity of the voice before making the disclosure that it was the Plaintiff.

126.     Plaintiff has suffered irreparable harm, both professionally and personally, as a result of this unlawful disclosure.


## COUNT VII

### Hostile Work Environment as a Result of Race and Sex Discrimination

127.     Plaintiff realleges and incorporates by reference each of the preceding paragraphs as if fully set forth herein.

128.     When hostile work environment is alleged to have occurred as a result of unlawful discrimination, Complainant must show that: (1) she belongs to a statutorily protected class; (2) she was subjected to harassment in the form of unwelcome verbal or physical conduct; (3) the harassment complained of was based on her statutorily protected class; (4) the harassment affected a term or condition of employment[2] and/or had the purpose or effect of unreasonably interfering with the work environment and/or creating an intimidating, hostile, or offensive work environment; and (5) there is a basis for imputing liability. *See Henson v. City of Dundee*, 682 F.2d 897 (11th Cir. 1982); *Humphrey v. United States Postal Service*, EEOC Appeal No, 01965238 (October 16, 1998); *Harris v. Forklift Systems, Inc.*, 510 U.S. at 21 (1993).

129.     Plaintiff belongs to a statutorily protected class as an African American woman.

130.     Plaintiff was subjected to continuous harassment in the forms of verbal and physical conduct, such as the use of racial epithets, from the Defendant and agents of the Defendant.

---

[2] The phrase "terms, conditions and privileges of employment" in Title VII is an expansive concept which sweeps within its protective ambit the practice of creating a working environment heavily charged with racial discrimination (or retaliation). One can readily envision working environment so heavily polluted with discrimination as to destroy completely the emotional and psychological stability of group of workers. *Rogers v. EEOC*, 454 F.2d 234 (1971).

131.    Plaintiff was subjected to continuous harassment in the forms of verbal and physical conduct from the Defendant and agents of the Defendant that was directly related to her position as a statutorily protected class member.

132.    The harassment that the Plaintiff was subjected to unreasonably interfered with her ability to complete her responsibilities by creating an intimidating, hostile, or offensive work environment that she did not feel safe in attending on a daily basis.

133.    The above conduct was enabled and encouraged by the Defendant and was unwelcome by the Plaintiff.

134.    Defendant's inability to cease the above conduct and repair the effects of this unlawful personnel action demonstrates that they were a contributing factor to the hostile work environment experienced by the Plaintiff.

135.    Plaintiff has suffered irreparable harm, both professionally and personally, as a result of this unlawful conduct.

## COUNT VIII

**Maryland Fair Employment Practices ACT (FEPA). Md. Code §20-601 *et seq*.**

136.    Plaintiff realleges and incorporates by reference each of the preceding paragraphs as if fully set forth herein.

137.    The Maryland Fair Employment Practices Act (FEPA), Md. Code Ann., State Gov't, § 20-601 *et seq*. outlaws discrimination in employment based on race, color, religion, sex, age, national origin, marital status, sexual orientation, gender identity, genetic information, or disability by employers with more than 15 employees.

138.    Under FEPA, an employer can be held legally responsible if the person responsible for the harassment can make or recommend employment decisions (e.g., hiring and firing,

promotion and demotion, and reassignments) **or** directs, supervises, or evaluates the work activities of the employee, even if that person does not have the power to make employment decisions. Additionally, an employer can be liable if its own negligence leads to harassment or enables harassment to continue.

139.     Harassment is unwelcome or offensive conduct that is based on "race, color, religion, ancestry or national origin, sex, age, marital status, sexual orientation, gender identity, or disability."

## COUNT IX

### Retaliation in Violation of Title VII of the Civil Rights Act of 1964

140.     Plaintiff re-alleges and incorporates by reference each and every allegation in the paragraphs above, as if fully set forth herein.

141.     Title VII of the Civil Rights Act prohibits an employer from "discriminat[ing] against any individual with respect to [his] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin," 42 U.S.C. § 2000e–2(a)(1), and from retaliating against employees for engaging in activity protected by Title VII, *id.* § 2000e–3(a). To that end, an employer may not create or condone a hostile or abusive work environment that is discriminatory. *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 64–65 (1986).

142.     Here, Plaintiff was retaliated against after reporting and advocating against the discrimination and differential treatment that she and her players were experiencing.

143.     Defendant subjected Plaintiff to the aforementioned adverse employment actions because of her opposition to the unlawful and discriminatory employment practices of Defendant in violation of Title VII.

144.     Defendant, including Plaintiff's supervisors, knew of Plaintiff's engagement in protected activity prior to engaging in the aforementioned adverse actions when they were informed by Plaintiff directly or otherwise should have known that Plaintiff engaged in statutorily-protectivity activity.

145.     The adverse retaliatory actions to which Plaintiff has been subjected to are a direct result of Plaintiff having previously engaged in statutorily-protected activity.

146.     Plaintiff's prior protected activity was a determining factor in Defendant's unlawful conduct toward Plaintiff.

147.     Plaintiff's prior protected activity was a motivating factor in Defendant's unlawful conduct toward Plaintiff.

148.     Similarly situated employees (no known prior EEOC activity) were not subjected to the same, similar, or any adverse treatment.

149.     Defendant's unlawful conduct has created a climate of fear and isolation for Plaintiff and other employees, which creates a chilling effect in violation of Title VII.

150.     The reasons proffered by Defendant for its unlawful conduct are pretextual and Defendant cannot further offer any legitimate reason for its unlawful conduct.

151.     Defendant's unlawful conduct negatively impacted the terms, conditions and privileges of Plaintiff's employment.

152.     Defendant's retaliatory conduct has been intentional, deliberate, willful, malicious, reckless and in callous disregard of the rights of Plaintiff because of his participation and opposition to Defendant's discriminatory conduct.

153.     Defendant is directly liable for the discriminatory acts or omissions of its agents, servants and employees while acting within the course and scope of their employment, under the theory of *Respondeat Superior*.

154.     As a direct and proximate cause of Defendant's conduct alleged throughout this Complaint, Plaintiff suffered and continues to suffer from harm, injury and monetary damages - including but not limited to past and future loss of income, benefits, career opportunities, medical expenses and costs - and is entitled to all available legal and equitable remedies.

155.     Plaintiff was humiliated, embarrassed and made to endure a great amount of pain and suffering, and her injury is permanent in nature. Further, Defendant's treatment and actions were ongoing.

156.     Plaintiff has incurred lost wages, loss of reputation, defamation of character, and loss of career opportunity now and into the future, and all of the other losses stated with Plaintiff contributing in any way thereto.

157.     Defendant must comply with Title VII, and by and through their conduct, violated the law.

158.     The reasons proffered by Defendants for their unlawful conduct are pretextual and Defendants cannot offer any legitimate reason for their unlawful conduct.

159.     Defendant is directly liable for the discriminatory acts or omissions of its employees while acting within the court and scope of their employment, under the theory of *Respondeat Superior*.

160.     Defendants actions were intentional, reckless, and malicious.

161.     As a direct and proximate cause of Defendants' conduct alleged throughout this complaint, Plaintiff suffered and continues to suffer from harm, injury, and monetary damages—including but not limited to past and future loss of income, benefits, and career opportunities—and is entitles to all available legal and equitable remedies.

162.     Plaintiff was humiliated, embarrassed, and made to ensure a great amount of pain and suffering. Plaintiff's injury is permanent in nature. Further, Defendants actions were ongoing.

163.     Plaintiff has incurred lost wages, loss of reputation, defamation of character now and into the future, and all of the other losses stated with Plaintiff not contributing in any way thereto.

**WHEREFORE**, Plaintiff respectfully requests that the Court GRANT an award of compensatory damages against Defendant that exceeds $500,000, specific performance, and award such other and further relief deemed fair and just.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff respectfully prays that this Honorable Court:

1.  Award damages including but not limited to repayment to Plaintiff in the form of backpay, front pay, out of pocket expenses, and ancillary expenses and costs;
2.  Award compensatory damages in the amount of $500,000
3.  Enter a declaratory judgement finding that the foregoing actions of Defendant violated Maryland law;
4.  Enter an amount equal to the tax on any award, interest, and costs;
5.  Enter a permanent injunction directing Defendant to take all affirmative steps necessary to remedy the effects of the illegal conduct described herein and to prevent similar occurrences in the future;
6.  Award Plaintiff reasonable attorneys' fees and costs incurred in this action; and
7.  Order such other relief as this Court deems just and equitable.

## JURY TRIAL

Plaintiff requests a jury trial for all issues so triable herein.

Dated: May 14, 2021

Respectfully submitted,

By: /s/ Dionna Maria Lewis

Dionna Maria Lewis, Esq.
(Bar No. 19486)
District Legal Group, PLLC
700 Pennsylvania Ave SE, Suite
2098 Washington, D.C. 20003 Tel.
(202) 486-3478 |
Dionna@DistrictLegalGroup.com
*Counsel for Ashley Bush*