# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **ASHLEY BUSH,** | * | |
| **Plaintiff,** | * | |
| | | **Case No. 1:21-cv-01190-JRR** |
| **v.** | * | |
| **FREDERICK COUNTY PUBLIC SCHOOLS,** | * | |
| **Defendant.** | * | |

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

## <u>MEMORANDUM OPINION</u>

This case arises out of Plaintiff's termination of employment with Frederick High School ("FHS"). This matter comes before the court on Defendant Frederick County Public Schools' ("FCPS") Motion for Summary Judgment (ECF No. 41; the "Motion"). The parties' submissions[1] have been reviewed, and no hearing is necessary. Local Rule 105.6 (D. Md. 2021). For the reasons set forth herein, the Motion will be granted.

## BACKGROUND

### I.  PROCEDURAL HISTORY

Almost ten months after Plaintiff was terminated from employment with FHS, she filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") signed and dated December 1, 2020 (the "Charge"). (ECF No. 41-1, p. 23.) In her Charge, Plaintiff claims she was subjected to discrimination based on race, sex, and retaliation. The EEOC issued

---

[1] Defendant filed a Motion to Strike (ECF No. 50) Plaintiff's Response in Opposition (ECF No. 46), which was granted by an Order of this court (ECF No. 62). Accordingly, the court will treat Defendant's Motion for Summary Judgment as unopposed.

both the Notice of the Charge of Discrimination to Defendant and its Dismissal and Right to Sue Letter to Plaintiff on February 24, 2021.  *Id.* at 24.

On May 14, 2021, Plaintiff filed a Complaint alleging discrimination on the basis of her race and sex/gender.  (ECF No. 1.)  The Complaint sets forth nine counts for: Race Discrimination in Violation of Title VII of the Civil Rights Act of 1964 (Count I); Sex Discrimination in Violation of Title VII of the Civil Rights Act of 1964 (Count II);  Breach of Written Employment Agreement (Count III); Wrongful Termination (Count IV); Violations of Maryland's Wiretap Statute (Count V); Defamation (Count VI); Hostile Work Environment as a Result of Race and Sex Discrimination (Count VII); Violation of  Maryland Fair Employment Practices Act ("MFEPA"); Md. Code § 20-601 *et seq.* (Count VIII); and Retaliation in Violation of Title VII of the Civil Rights Act of 1964 (Count IX). (ECF No. 1.)

The prayer for relief includes: (1) damages including but not limited to repayment to Plaintiff in the form of backpay, front pay, out of pocket expenses, and ancillary expenses and costs; (2) compensatory damages in the amount of $500,000; (3) declaratory judgment finding that the actions of Defendant violated Maryland law; (4) an amount equal to the tax on any award, interest, and costs; (5) permanent injunction directing Defendant to take all affirmative steps necessary to remedy the effects of the alleged misconduct and prevent similar occurrences in the future; (6) reasonable attorneys' fees and costs; (7) any other relief this court deems just and equitable. *Id.* at 33.

## II. STATEMENT OF UNDISPUTED FACTS[2]

### A. Plaintiff's Employment

The following facts are undisputed:

In 2015, Defendant hired Plaintiff to serve as the head coach of the girls' basketball team at FHS, which was a temporary, at-will employment position (ECF No. 41, p. 4.)   Head coaches report to the athletic director and principals for the schools where they work and are paid by stipend and the conclusion of each sports season.   *Id.*   The school principal is responsible for making employment decisions related to the head coach, including hiring and firing.   *Id.* at p. 5.   After being hired in 2015, Plaintiff signed an Assignment-Acknowledgement of Additional pay during the fall of each year prior to the start of basketball season.   *Id.*   On or about September 26, 2019, Plaintiff signed the Assignment-Acknowledgement accepting the position of Head Coach for the FHS girls basketball team. The 2019 Assignment Acknowledgement that Plaintiff signed provides in relevant part: "I voluntarily accept the position as an at-will position, non-tenured."   (ECF No. 41-3.)   On September 26, 2019, Plaintiff also signed a Coach Acknowledgment which provides that, as  head coach, Plaintiff was required to comply with the Board of Education ("BOE") policies and FCPS regulations as they pertain to her employment.   *Id.*   Plaintiff's job responsibilities and conduct expectations as head coach were set forth in the FCPS Athletic Handbook.   (ECF No. 41-7.)

### B. FCPS Discrimination and Retaliation Policies

During Plaintiff's employment, FCPS maintained BOE Policy 309 regarding discrimination and harassment.   (ECF Nos. 41-1, p. 5; 41-8.)

---

[2] "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56 (c), the court may… (2) consider the fact undisputed for purposes of the motion."   FED. R. CIV. P. 56(e)(2).   Because Plaintiff's Opposition was stricken by the court, she has failed to address Defendant's assertions of fact as set forth in its Motion. Accordingly, the court will treat the facts asserted by Defendant as undisputed.

**Purpose**
To provide an environment that is free from discrimination and harassment based on a person's membership in a protected class.

**Definitions**
Discrimination – any act or omission due to an individual's status or perceived status in a protected class that creates an intimidating, hostile, or offensive working environment or educational environment, or substantially interferes with an individual's ability to work, learn, or access programs while on Frederick County Public Schools (FCPS) property or at a school activity or event.

Harassment – is defined as intentional, negative actions that offend, ridicule, or demean another based on a protected class.

**Policy Statement**
The Board of Education (Board) is committed to providing students, staff and community members with a safe and supportive environment. Members of the school community are expected to treat each other with mutual respect and to accept the rich diversity that makes up the community. Disrespect among members of the school community is unacceptable behavior and disrupts the learning and work environment.

Except where the employment of a certain gender may be reasonably necessary as a bona fide occupational qualification, the Board prohibits discrimination based on the following protected classes under Maryland and federal law: race, religion, color, ancestry, national origin, age, marital status, disability, pregnancy, sexual orientation, gender identity, sex, or genetic information. The Board is committed to maintaining an environment that is free from such conduct on and off school premises, including all events and extracurricular activities under the auspices of the Board.

(ECF No. 41-8.)

C.    *The Linganore Game*

On or about January 19, 2018, Linganore High School ("LHS") hosted FHS for junior varsity and varsity basketball games. (ECF No. 41-1, p. 6.)  Following the basketball games, Plaintiff and several members of the FCPS community complained to FCPS about the overall environment at the game, including LHS spectators yelling at the student-athletes and Plaintiff.

4

*Id.* at p. 7.   The FCPS Supervisor of Athletics and Extracurricular Activities and FCPS Director of High Schools initiated an investigation into accusations of racial slurs and gestures made at the basketball game and physical contact made between Plaintiff and the head coach for LHS.  As a part of the investigation, FCPS administrators reviewed the report prepared by the game officials, game film, photographs and video related to the game, and statements provided by student-athletes, coaches, athletic directors, the administrator or duty, operations staff members, security officer, scorers table personnel, and spectators.  (ECF No. 41-9, pp. 1-2.)  Additionally, the officials interviewed Plaintiff, the head coach for LHS, LHS' Athletic Director and Assistant Principal, FHS' Coordinator of Athletics, Extracurricular Activities, Facilities & Campus Improvement, and a spectator from the game.  *Id.* at pp. 2-5.  After the investigation, the FCPS officials documented their investigation, findings, and recommendations in a six-page report dated February 2, 2018.  (ECF Nos. 41-1, p. 8; 41-9.)   In addition to the recommendations set forth in the report, FCPS implemented several actions aimed at ensuring that instances like the ones at the basketball game would not occur in the future.  (ECF No. 41-1, pp. 8-10.)  These actions included:

- Facilitating meetings among the Superintendent and other FCPS administrators, and the student-athletes and parents from both schools to address any concerns;

- Holding the 2018 playoff game between FHS and LHS at a neutral location;

- Expanding cultural proficiency training to coaches and game officials, where it was previously only provided to Athletic Directors and other administrators;

- Amending its policy on extracurricular and co-curricular activities to create a code of standards, reporting, and discipline policy for students, FCPS employees, volunteers, and spectators during extra-curricular activities;

- Establishing written mandatory reporting procedures for staff regarding racial slurs;

- Requiring the Superintendent to attend all coach meetings for all sports the following school year to reiterate FCPS' expectations that coaches immediately report and address instances of racial or other derogatory slurs at extracurricular events; and

- Issuing a letter to the spectator that approached Plaintiff after the Linganore Game, indicating that his behavior was inappropriate and banning him from FHS games for the balance of the season.

(ECF No. 41-1, pp. 8-10.)

Following issuance of the investigation report, the principals of LHS and FHS addressed specific sportsmanship issues with Plaintiff and the head coach of LHS. Plaintiff was neither demoted nor suspended, nor did she suffer any wage-related penalty or punishment as a result of the incident. (ECF No. 41-1, p. 10-12.) Plaintiff remained employed as head coach of the FHS girls basketball program the following year. *Id.*

### D.    *The Walkersville High School Basketball Game*

On or about January 15, 2019, the FHS varsity girls basketball team played a game at Walkersville High School ("WHS") (the "Walkersville Game"). After one of the FHS players was fouled by a player from the other team, Plaintiff had a verbal exchange with the game officials regarding the foul. Plaintiff expressed that the game officials were being racially biased against her players. (ECF Nos. 41-1, p. 12; 41-5, 273:4-22.) Following the game, a game official complained to FHS about Plaintiff's behavior at the game. Plaintiff discussed her concerns regarding the incident at the Walkersville Game with the FHS Athletic Director. (ECF No. 41-1, p. 12.) In turn, FHS discussed Plaintiff's concerns with the contractor it used to supply game officials. *Id.* at p. 13. Following a response from the contractor, the FHS Athletic Director issued a "Letter of Concern" to Plaintiff which stated:

> Moving forward, we discussed the need to bring these concerns to the athletic director, immediately. While it is ok to disagree with a call, there is a time and venue to do this. During an athletic contest is not the appropriate time.
>
> Should an occurrences [sic] like this happen again, you could face discipline up to removal as head coach.

6

(ECF No. 41-19.)  The letter was signed by the FHS Athletic Director and Plaintiff.  *Id.*  Plaintiff drafted a rebuttal to the letter.  Plaintiff was neither suspended nor demoted, nor was her yearly coaching stipend reduced as a result of the Walkersville Game or subsequent Letter of Concern. Plaintiff admits the FHS Athletic Director was not discriminating against her in issuing the Letter of Concern. (ECF No. 41-5, 279:20-280:1-12.)

### E.       Plaintiff is Suspended with Pay for One Game

Plaintiff, along with an assistant coach, created a Facebook page called "FGB Power." FGB stands for "Frederick Girls Basketball."  (ECF No. 41-1, p. 14.)  On April 15, 2019, Plaintiff authored a post sharing a news article from the Frederick News Post that named an FHS player and a player from another school within FCPS as "Co-Player of the Year" for girls basketball (the "Co-Player of the Year Post.")  *Id.;* ECF No.  41-21.  The FHS administration found that the Co-Player of the Year Post was inappropriate and violated the FCPS social media policy.  (ECF No. 41-1 p. 14; 41-22.)  On June 4, 2019, the FHS principal sent Plaintiff a "Letter of Reprimand." (ECF No. 41-26.)  The Letter states in pertinent part:

> On April 16 you were asked by FHS Athletic Director Keivette Hammond to remove a post on social media that had been determined to be a violation of FCPS Regulation 100-08. After a few days had passed and the post was not removed AD Hammond again asked that the post be taken down, and it was not.  On April 23 I emailed you with the request that the post be taken down with an explanation of Reg 100-08 attached to the e-mail.  Again, the post was not removed. I then again emailed you a request the post be taken down, this time giving you a specific date and time that I expected the post to be removed. It was then taken down.
>
> I expressed to you my concerns that you did not comply with miss Hammond's request twice and my request once. This form of insubordination is inappropriate from any FCPS staff member.
>
> As a response to these actions you will be suspended from your coaching duties for the first game of the 2020 basketball season. It

> is important that you understand that when a supervisor such as myself or Ms. Hammond make a reasonable request, it is our expectation it is carried out the first time. If you do not feel the request is reasonable you need to reach out [sic] the immediate supervisor of the person making the request. Further violations of FCPS regulations and policies will result in further disciplinary measures up to and including termination.

*Id.*

Pursuant to FCPS policy, Plaintiff had 30 days to appeal her suspension.  On December 4, 2019, six months after the Letter of Reprimand was issued, Plaintiff submitted an Appeal Information Form – Superintendent Level to Dr. Alban.[3]  (ECF No. 41-28; "Suspension Appeal".)  In her Suspension Appeal, Plaintiff argued that the suspension was improper and requested to be able to coach her team during the first game of the 2019-20 season.  Dr. Alban agreed to hear Plaintiff's appeal, but Plaintiff did not appear for the set hearing.  (ECF No. 41-1, p. 17.)  FCPS did not take any further action related to Plaintiff's Suspension Appeal.  *Id.*  Plaintiff did not lose any portion of her stipend as a result of the suspension and was brought back as the head coach for the 2019-20 season.  *Id.*

### F.   *Plaintiff Investigated after Five Varsity Players Quit Team*

On February 5, 2020, three senior basketball players quit the varsity team.  (ECF No. 41-18.)  On the same day, Plaintiff cancelled basketball practice and held a team meeting in an FHS classroom.  *Id.*  The meeting included Plaintiff, two assistant coaches, a third-party not affiliated with FCPS, and approximately eight student-athletes who remained on the team.  *Id.*   In her Supplemental Answers to Interrogatories, Plaintiff explained:

> During this team meeting, Plaintiff encouraged the players to speak openly and honestly about their feelings and discussed their concerns for how to handle the backlash from the media and community inquiries. The players reiterated that they wanted to remain on the team and accomplish the goals they established at the beginning of the season. Plaintiff then shared her own personal

---

[3] Dr. Theresa Alban was the FCPS Superintendent at the time.

> experiences with the sport in order to be more relatable and understanding to the players as an African American woman coaching a mostly African American team. Plaintiff concluded the meeting with a final activity titled, "Protect Your Environment Circle activity which is meant to foster camaraderie and friendship amongst teammates."

(ECF No. 41-31, pp. 42-43.)

Following the resignation of the first three players, the FHS administration received complaints from players and their parents about Plaintiff's behavior towards students, and her "emotionally and mentally abusive" coaching style. (ECF No. 41-34, p. 1.) Shortly after the three players quit, two additional players quit the varsity basketball team. (41-1, p. 18.) The FHS principal instructed the assistant principals to investigate the complaints about Plaintiff. (ECF No. 41-18, p. 4.) The assistant principals conducted their investigation from February 6, 2020, through February 11, 2020. They interviewed the three girls who initially quit and their parents, Plaintiff, two assistant coaches, and other past and present members of the team. (ECF No. 41-34, p. 2.) Following the investigation, the principal and assistant principals determined there was not enough evidence to substantiate the complaints of "abuse." *Id.* Nonetheless, the FHS administration was concerned about Plaintiff's professionalism given the complaints from students and parents. (ECF No. 41-18, p. 5; 41-34, p.2.)

On February 14, 2020, the FHS administration became aware of a recording that had been circulating on Facebook. (ECF No. 41-1, p. 20.) According to Defendant's unopposed transcription, the recording is of Plaintiff's voice, and she is heard to say:

> …And I use sports to make you guys so damn strong that we can get to the point of, and I apologize for saying it, but fuck white people. That's right. That's where I'm at, um, especially with how society is and so I think sometimes I go overboard...

*Id.*  The same day FHS administrators received the recording, the principal and assistant principals held a meeting with Plaintiff to determine if she made the statements on the recording, and to explain the context of the statement.  *Id.*   According to Dr. David Franceschina, FHS principal, Plaintiff admitted that the recording sounded like her, but said she did not recall saying the exact words on the recording.  (ECF No. 41-18, p. 5.)  Despite Plaintiff's inability to remember her exact words, she provided the context of the statement when questioned by Dr. Franceschina.  *Id.*  Dr. Franceschina testified further (via affidavit), that based on Plaintiff's responses to his inquiries, he believed it to be Plaintiff on the recording and, therefore, suspended her pending investigation.  *Id.*

After further investigation, on February 18, 2020, the principal, assistant principals, and athletic director met with Plaintiff and her attorney to give Plaintiff a copy of her termination letter. (ECF No. 41-1, p. 22.)  The termination letter stated in pertinent part:

> When presented with this recording, at a meeting that same afternoon, you stated that it was you in the recording. You said you were speaking with your players in a classroom at Frederick High School addressing them after the senior starters on your team had quit...
>
> As a school system we cannot tolerate this type of behavior from our employees. Your actions are also in violation of Frederick County Public Schools, Board of Education policy 309: Discrimination Unlawful, which states:
>
> > *The Board of Education (Board) is committed to providing all students and staff with a safe and supportive environment. Members of the school community are expected to treat each other with mutual respect and to accept the rich diversity that makes up the community. Disrespect among members of the school community is unacceptable behavior and disrupts the learning and work environment.*
>
> Adults are to serve as role models for the students they work with; The divisive words you spoke to your players do not represent the values of our school system.

> As a result of your actions, you will be terminated as head coach of the Frederick High School girls basketball team effective immediately...

(ECF No. 41-37.)  Despite her termination prior to the finish of the 2019-20 season, Plaintiff was paid her full coaching stipend.  (ECF No. 41-1, p. 23.)

## LEGAL STANDARDS

Rule 56 of the Federal Rules of Civil Procedure provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A material fact is one that "might affect the outcome of the suit under the governing law." *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A genuine issue over a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.  When considering a motion for summary judgment, a judge's function is limited to determining whether sufficient evidence exists on a claimed factual dispute to warrant submission of the matter to a jury for resolution at trial.  *Id*. at 249.  Trial courts in the Fourth Circuit have an "affirmative obligation . . . to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993)).  A "party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences." *Shin v. Shalala,* 166 F. Supp. 2d 373, 375 (D. Md. 2001) (citations omitted).

Further, in undertaking this inquiry, the court must consider the facts and all reasonable inferences in the light most favorable to the nonmoving party.  *Libertarian Party of Va.*, 718 F.3d at 312; *see also Scott v. Harris*, 550 U.S. 372, 378 (2007).  Critically, on a Rule 56 motion, the court "must not weigh evidence or make credibility determinations." *Foster v. University of Md.-*

*Eastern Shore*, 787 F.3d 243, 248 (4th Cir. 2015) (citing *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007)); *see also Jacobs*, 780 F.3d at 569 (explaining that the trial court may not make credibility determinations at the summary judgment stage). Indeed, it is the function of the fact-finder to resolve factual disputes, including issues of witness credibility. *See Tolan v. Cotton*, 572 U.S. 650, 660 (2014).

Because the court struck Plaintiff's response to the Defendant's Motion, the Motion is unopposed. Nonetheless, the court must still determine that there are no genuine issues of material fact and that Defendant is entitled to judgment as a matter of law. *Custer v. Pan Am. Life Ins. Co.,* 12 F.3d 410, 416 (4th Cir. 1993). "Although the failure of a party to respond to a summary judgment motion may leave uncontroverted those facts established by the motion, the moving party must still show that the uncontroverted facts entitle the party to 'a judgment as a matter of law.'" *Id.*

## ANALYSIS

### I.    Title VII Claims

#### A.    *Statute of Limitations*

Defendant argues that Plaintiff's claims for race and sex discrimination set forth in Counts I, II, VII, VIII, and IX are barred by the statute of limitations. Defendant avers that the court should only consider allegations related to Plaintiff's termination on February 18, 2020, in deciding these claims. (ECF No. 41-1, p. 27.)

"Title 42 U.S.C. § 2000e-5(e)(1) is a charge filing provision that 'specifies with precision' the prerequisites that a plaintiff must satisfy before filing suit." *AMTRAK v. Morgan,* 536 U.S. 101, 109 (2002) (quoting Alexander v. Gardner-Denver Co., 415 U.S. 36, 47 (1974)). Section 2000e-5(e)(1) provides two statutory time periods for an aggrieved individual to serve notice upon

the person or entity against whom the charge is made. *Id.*   A charge must be filed within one hundred eighty days after the alleged unlawful employment practice occurred unless the aggrieved person initiated proceedings with a State or local agency, in which case the aggrieved person has 300 days after the alleged employment practice occurred to file a charge. § 2000e-5(e)(1); *Tinsley v. First Union Nat'l Bank,* 155 F.3d 435, 439 (4th Cir. 1998).   Therefore, a person must file a charge within 180 or 300 days of the alleged unlawful practice depending on whether a proceeding was initiated at the state or local level, and "a claim is time barred if it is not filed within these time limits."   *Id.; AMTRAK,* 536 U.S. at 109.   The Supreme Court has held that discrete discriminatory acts that occur outside of the 180- or 300-day limitation period, may not be considered by the court. *Id.* at 113.

"Discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify. Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.'" *Id.* at 115.   Plaintiff therefore may redress here only those discrete acts that 'occurred' within the 180-day time period of her administrative complaint. *Id.*

"Under MFEPA, [Plaintiff] is required to exhaust the administrative process." *Bales v. Md. Judiciary/Administrative Office of the Courts,* 2016 U.S. Dist. LEXIS 161581 *25 (D. Md. Nov. 21, 2016) (citing MD. CODE ANN., STATE GOV'T § 20-1013(a)). "A plaintiff exhausts his administrative remedies by filing an EEOC charge and obtaining a 'right-to-sue' letter. *Id.* at *26 (citations omitted).  "Specifically, under MFEPA, 'a complainant may bring a civil action against the respondent alleging an unlawful employment practice, if: (1) the complainant initially filed a timely administrative charge or a complaint under federal, State, or local law alleging an unlawful employment practice by the respondent; (2) at least 180 days have elapsed since the filing of the

administrative charge or complaint; and (3) the civil action is filed within 2 years after the alleged

unlawful employment practice occurred.'"  *Id.* (quoting MD. CODE ANN., STATE GOV'T § 20-

1013(a)(1-3)).  "For the first requirement under § 20-1013(a), '[t]imeliness [is] to be strictly

enforced.'"  *Id.* (quoting *Tangires v. Johns Hopkins Hosp.*, 79 F. Supp. 2d 587, 597 (D. Md. 2000)).

Plaintiff alleges:

> Plaintiff has exhausted all of her administrative remedies.
>
> Plaintiff filed a charge with the Baltimore Field Office of the U.S. Equal Employment Opportunity Commission ("EEOC") alleging discrimination based on race (African American), sex (female), and retaliation (prior statutorily protected activity).
>
> The EEOC issued Plaintiff a Right-to-Sue Letter dated February 24th 2021, informing her that she has ninety (90) days upon receipt of the notice, to file suit in the appropriate court.
>
> Plaintiff received the Right-to-Sue Letter on February 27, 2021. Accordingly, Plaintiff timely filed this action in accordance with the Notice of Rights, which provided Plaintiff the right to file this complaint within 90 days of the receipt of the Notice.

(ECF No. 1, ¶¶ 10-13.)  Plaintiff does not allege, and there is no evidence in the record, that

Plaintiff initiated proceedings with a State or local agency related to her claims of discrimination.

Accordingly, the limitations period applicable to Plaintiff's Title VII claims is 180 days.  § 2000e-

5(e)(1).

Plaintiff filed her Charge with the EEOC on December 14, 2020.  In her Charge, Plaintiff

identifies January 19, 2018, as the earliest date of alleged discrimination and February 18, 2020,

as the latest date of discrimination.  January 19, 2018, was the Linganore basketball game and

February 18, 2020, was the date of Plaintiff's termination.  Plaintiff's Charge further states, "Ms.

Bush reiterates that she was discriminated against on the following basis: race, sex, retaliation, and

hostile work environment."  Plaintiff does not allege any acts of discrimination beyond February

14

18, 2020.  Therefore, the last date on which Plaintiff could file a charge with the EEOC to complain of incidents of discrimination was August 17, 2020.  The allegations in the Charge are untimely under both §2000e-5(e)(1) and MD. CODE ANN., STATE GOV'T § 20-1013(a)(1).  The court may not consider any of the discrete discriminatory acts raised by Plaintiff, and Plaintiff fails to allege or provide evidence of any discriminatory acts that occurred within 180 days of the Charge. Accordingly, Defendant has satisfied its burden to demonstrate that there is no genuine dispute of material fact and that it is entitled to judgment as a matter of law on Plaintiff's Title VII and MFEPA claims.  The Motion will be granted as to Counts I, II, VII, VIII, and IX.

### B.    The McDonnell Douglas Burden Shifting Framework

Although the court finds that the 180-days statute of limitations period entitles Defendant to judgment on Plaintiff's Title VII claims, for purposes of completion the court will address Defendant's remaining Title VII arguments.  The court notes that Defendant takes the position that Plaintiff was subject to the 300-day limitations period under § 2000e-5(e)(1).  Based on its position, Defendant avers that the February 18, 2020, employment termination falls within the limitations period and may be considered by the court.  Defendant, however, argues that Plaintiff has not established a prima facie case of discrimination under the burden-shifting framework set forth in *McDonnel Douglas Corp. v. Green,* 411 U.S. 792 (1973).   (ECF No 41-1, p. 28.) Defendant further argues that, even if the court finds that Plaintiff has established a prima facie case, it is entitled to summary judgment because Plaintiff cannot prove that Defendant's reason for terminating her employment was pretextual.  *Id.* at p. 36

"To demonstrate the prima facie case of sex or [race] discrimination under the pretext framework, the plaintiff must show that (1) she is a member of a protected class; (2) she suffered adverse employment action; (3) she was performing her job duties at a level that met her

employer's legitimate expectations at the time of the adverse employment action; and (4) the position remained open or was filled by similarly qualified applicants outside the protected class." *Hill v. Lockheed Martin Logistics Mgmt.,* 354 F.3d 277, 286 (4th Cir. 2004). "If a prima facie case is presented, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action." "Assuming the employer meets this burden of production, 'the *McDonnell Douglas* framework - with its presumptions and burdens - disappears, and the sole remaining issue [is] discrimination vel non.' *Id.* (quoting *Reeves v. Sanderson Plumbing Prods.*, Inc., 530 U.S. 133, 142-42 (2000) (internal quotation marks omitted). "In other words, the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the employer's stated reasons 'were not its true reasons, but were a pretext for discrimination.'" *Id.* (quoting *Reeves*, 530 U.S. at 143.)

The *McDonnell Douglas* burden-shifting framework also applies to Title VII claims for retaliation. *Foster v. Univ. of Maryland-Eastern Shore,* 787 F.3d 243, 250 (4th Cir. 2015) "To prevail under the *McDonnell Douglas* framework, [Plaintiff] must first establish a prima facie case by showing: (i) 'that [she] engaged in protected activity,' (ii) 'that [her employer] took adverse action against [her],' and (iii) 'that a causal relationship existed between the protected activity and the adverse employment activity.' *Id.* (quoting *Price v. Thompson*, 380 F.3d 209, 212 (4th Cir. 2004)). "The burden then shifts to the [Defendant] to show that its purportedly retaliatory action was in fact the result of a legitimate non-retaliatory reason." *Id.* (citing *Hill*, 354 F.3d at 285)). "If the employer makes this showing, the burden shifts back to the plaintiff to rebut the employer's evidence by demonstrating that the employer's purported nonretaliatory reasons 'were not its true reasons, but were a pretext for discrimination.'" *Id.* (citations omitted).

16

In this instance, even if the court were to determine that Plaintiff established a *prima facie* case for discrimination, retaliation, or both, Defendant would still be entitled to judgment as a matter of law because Plaintiff has failed to demonstrate that the reason for her termination was a pretext for discrimination. Defendant offers that Plaintiff was terminated because of statements made by Plaintiff that the FHS principal deemed to be inconsistent with school values and FCPS' policy against discrimination. Plaintiff has neither provided any evidence that Defendant's proffered reasons for Plaintiff's employment termination are false, nor has she established that the real reason for termination of her employment was discrimination or retaliation. Accordingly, even if Plaintiff's allegations in support of her Title VII claims were not time barred, Defendant would still be entitled to judgment as a matter of law, as Plaintiff cannot satisfy its burden of demonstrating pretext and discrimination. *See Diamond v. Colonial Life & Accident Ins. Co.,* 416 F.3d 310, 320 (4th Cir. 2005) (affirming summary judgment in favor of employer on discrimination claim where the plaintiff failed to produce "sufficient evidence of pretext to 'avert summary judgment.'") (quoting *Hill*, 354 F.3d at 285).

### D.      Hostile Work Environment

In addition to arguing that the statute of limitations bars Plaintiff's hostile work environment claim, Defendant argues Plaintiff cannot establish a prima facie case for hostile work environment. (ECF No. 41-1, p. 45.) In support, Defendant asserts that Plaintiff cannot point to any instance of harassment outside of the alleged discrete instances of perceived retaliation. *Id.* Defendant further argues that Plaintiff has failed to offer evidence that she suffered a hostile work environment on the basis of her sex. *Id.*

In order to establish a prima facie case, and avoid summary judgment, Plaintiff must demonstrate, "(1) [she] experienced unwelcome harassment; (2) the harassment was based on [her]

race, color, religion, national origin, or age; (3) the harassment was sufficiently severe or pervasive to alter the conditions of [her] employment and to create an abusive atmosphere; and (4) there is some basis for imposing liability on the employer." *Baqir v. Principi,* 434 F.3d 733, 745-46 (4th Cir. 2006).

At deposition, on inquiry regarding the Linganore game, Plaintiff testified:

> Q: And when you complained about it, you complained about how it affected the health and welfare of your players, right?
>
> A: Yes.
>
> Q: You did not complain that it created a hostile environment for you, did you?
>
> A: The hostile work environment was after I started speaking up and then I started receiving consequences for speaking up.
>
> Q: So we're talking about retaliation there. You spoke up about the harassment or alleged harassment toward your players. You spoke up about it and you were – it's your allegation you were retaliated against because you spoke up for your players.
>
> A: I'm saying both things happened and both things occurred. I spoke up and there was retaliatory action. But it's a hostile environment when you're asking people to validate your experience and put in protections and that doesn't happen and they're just, you know, tone deaf to it and they're not acknowledging that you experienced what you experienced, yeah, that became difficult to work under.

(ECF No. 41-5, 216:17-217:19.)

According to Plaintiff's deposition testimony, she bases her hostile work environment claim on the lack of validation and "protections" implemented by FHS administration when she spoke up for her players in relation to the Linganore and/or Walkersville Games, and, it stands to reason, her termination. These isolated, discrete acts are insufficient to support a hostile work environment claim. *Riley v. Buckner,* 1 Fed. Appx. 130, 133-34 (4th Cir. 2001).

Additionally, Defendant correctly notes that Plaintiff has neither alleged nor proffered evidence of a hostile work environment on the basis of her sex/gender.[4]  Accordingly, even if the court had not determined that the statute of limitations precluded Plaintiff's hostile work environment claim, Plaintiff has failed to establish a prima facie case, or generate a dispute of fact as to, sex/gender-based hostile work environment.  Therefore, Defendant is entitled to judgment as a matter of law as to Count VII.

## II.     Breach of Written Employment Agreement (Count III)

Defendant argues it is entitled to summary judgment on Plaintiff's breach of contract claim because she was an at-will employee.  Defendant further argues that Plaintiff cannot point to any contract or FCPS policy that would convert her at-will relationship into an implied contract for continued employment.  (ECF No. 41-1, p. 54.)

Plaintiff alleges:

> Plaintiff did not at any point during her employment with Frederick High School violate any section stipulated in the at will employment agreement.

> The Frederick County Board of Education and Frederick County Public Schools policies specifically prohibit discrimination and harassment in any form (BOE Policy 309).

> In participating in both discriminatory and harassing behavior, Defendants have violated their own policies that govern the provisions of the employment agreement, thereby breaching material elements of the agreement.

> Employment agreements in Maryland are presumptively at-will. However, a contract may "overcome that presumption and create an employment relationship whereby the employee may be terminated only for just cause." *Harig v. Progress Rail Servs. Corp.,* 166 F. Supp. 3d 542, 550 [(D. Md. 2015)].

> Defendant dismissed Plaintiff from her position based on an unverified conclusion that it was her voice captured on a recorded

---

[4] Plaintiff's hostile work environment claim centers around the alleged racial biases she and her players experienced.

statement constituted "hate speech," which is prohibited under the
Board of Education and Frederick County Public Schools policies
that govern employment agreement.

(ECF No. 1, ¶¶ 81, 83-83, 87, and 89.)

A "contract must be construed in its entirety and, if reasonably possible, effect must be

given to each clause so that a court will not find an interpretation which casts out or disregards a

meaningful part of the language of the writing unless no other course can be sensibly and

reasonably followed." *Cochran v. Norkunas*, 398 Md. 1, 17-18, (2007) (quoting *Sagner v.*

*Glenangus Farms*, 234 Md. 156, 167 (1964)). "Employer statements of policy, [] can give rise to

contractual rights in employees." *Staggs v. Blue Cross of Maryland, Inc.,* 61 Md. App. 381, 389

(quoting *Toussaint v. Blue Cross & Blue Shield of Mich.,* 408 Mich. 579 (1980)).

> [P]rovisions in such policy statements that limit the employer's
> discretion to terminate an indefinite employment or that set forth a
> required procedure for termination of such employment may, if
> properly expressed and communicated to the employee, become
> contractual undertakings by the employer that are enforceable by the
> employee.  In so holding, we caution that not every statement made
> in a personnel handbook or other publication will rise to the level of
> an enforceable covenant.  As the Minnesota Court observed in *Pine*
> *River State Bank, supra*, 333 N.W.2d at 626, "general statements of
> policy are no more than that and do not meet the contractual
> requirements for an offer."

*Staggs,* 61 Md. App. at 392.

Applying objective contract interpretation principles, the court must determine whether a

reasonable person in the parties' position would have thought that the contract provided any

measure of job security.  *Spacesaver Sys. v. Adam,* 440 Md. 1, 15 (2014).  The terms of the

Assignment-Acknowledgment signed by Plaintiff on September 26, 2019 (as well as prior

Assignment-Acknowledgements signed by Plaintiff), provide that Plaintiff is an at-will employee.

Accordingly, Plaintiff could have been terminated at any time for any reason not prohibited by

law.  *Holden v. Univ. Sys. of Md.,* 222 Md. App. 360, 366 (2015) (citing *Bagwell v. Peninsula Reg'l Med. Ctr.,* 106 Md. App. 470, 494 (1995)).   Further, Defendant's discrimination policy is a general statement of policy and does not create additional discretionary requirements relating to termination of Plaintiff's employment.   Accordingly, Defendant is entitled to judgment on Plaintiff's breach of contract claim. The Motion will be granted as to Count III.

## III.    Wrongful Termination (Count IV)

Defendant argues that it is entitled to summary judgment on Plaintiff's wrongful termination claim because the claim is preempted by Title VII and MFEPA.  (ECF No. 41-1, p. 52.)

The tort of wrongful or abusive discharge was "created so that the prospect of a remediless employee would not undercut the policies and goals that other laws sought to further."  *Makovi v. Sherwin-Williams Co.,* 316 Md. 603, 612 (1989).   "Several courts have held that an action for wrongful discharge does not lie, or that the public policy exception does not apply, where a statutory remedy to enforce the policy exists."  *Vasques v. Nat'l. Geographic Soc.,* 1982 U.S. Dist. LEXIS 17628 *7 (D. Md. Aug. 11, 1982) (citing *Bonham v. Dresser Industries, Inc.,* 569 F.2d 187, 197 (3d Cir. 1977)).

In *Chekey v. BTR Realty, Inc*., 575 F. Supp. 715 (D. Md. 1983) the Plaintiff asserted a wrongful discharge claim based on age discrimination in violation of Art. 49B and the Age Discrimination in Employment Act, 29 U.S.C. §§ 621-634. The *Chekey* Court found that:

> Because the Maryland legislature has already enacted an exception to the terminable at will doctrine based on acts of employment discrimination in Article 49B, and the Court of Appeals of Maryland, in considering the creation of a new judicially recognized cause of action for abusive discharge, noted that it was addressing a situation where there was no statutory remedy, this court concludes that the *Adler* [] decision is limited to its facts. There the Maryland appellate court recognized a claim of abusive discharge as an

> exception to the terminable at will doctrine when public policy is
> violated but where a statutory exception to that doctrine had not
> already been provided.

*Id.* at 717 (footnote omitted).   The *Chekey* Court concluded that, "Maryland courts have not

recognized a judicial exception to the terminable at will doctrine for a violation of clear public

policy where a statutory exception already exists to redress violations of that public policy."   *Id.*

at 717-18.

Here, Plaintiff's wrongful termination claim is based upon alleged discrimination against

her on the basis of her race and/or sex/gender. Both the protection of Plaintiff's rights at issue in

her wrongful termination claim and the remedy for violations of the same are found in both Title

VII and the MFEPA.  Because the alleged discrimination is addressed statutorily, the public policy

exception to at-will termination is precluded. Accordingly, Defendant is entitled to summary

judgment on Plaintiff's wrongful termination claim.  The Motion will be granted as to Count IV.

## IV.  Violation of Maryland's Wiretap Statute (Count V)

Defendant argues that it is entitled to summary judgment on Plaintiff's wiretap claim

because: (1) Plaintiff does not have standing to bring the claim, because she maintains that it is not

her on the recording; (2) the statement was not part of a private conversation and, therefore,

Plaintiff did not have a reasonable expectation of privacy in the statement; and (3) Defendant

lawfully accessed the recording after it was published on Facebook.  (ECF No. 41-1, pp. 58-62.)

Plaintiff alleges:

> Maryland's Wiretapping and Electronic Surveillance Act generally
> prohibits the willful interception, disclosure, and use of
> impermissibly intercepted communications. MD. CODE ANN., CTS.
> & JUD. PROC. § 10-402(a).
>
> Under the Act, oral communication is defined as "any conversation
> or words spoken to or by any person in private conversation."  MD.
> CODE ANN., CTS. & JUD. PROC. § 10-401(13)(i).

> Plaintiff maintains that she does not recall making the statements as captured on the recording.
>
> If it is determined to be the Plaintiff's voice on the recording, then it shall be found to be an unlawful capture and direct violation of Maryland's Wiretap Statute.
>
> If it is determined to be Plaintiff's voice on the recording, the Plaintiff maintains that she did not provide consent to be recorded as is required under the Maryland Wiretap Statute.
>
> If it is determined to be the Plaintiff's voice recording on the recording, disclosure of the recording is unlawful and prohibited since it was captured without the Plaintiff's full and knowledgeable consent.
>
> If it is determined to be the Plaintiff's voice on the recording, the distribution of the recording is unlawful and prohibited since it was captured without the Plaintiff's full and knowledgeable consent.

(ECF No. 1, ¶¶ 109-15.)

Section 10-402(a) of the Wiretapping and Electronic Surveillance Act provides:

> **(a)** Except as otherwise specifically provided in this subtitle it is unlawful for any person to:
>
> **(1)** Willfully intercept, endeavor to intercept, or procure any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication;
>
> **(2)** Willfully disclose, or endeavor to disclose, to any other person the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subtitle; or
>
> **(3)** Willfully use, or endeavor to use, the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subtitle.

MD. CODE ANN., CTS. & JUD. PROC. § 10-402(a).

Section 10-410 "provides for civil liability as an additional enforcement mechanism." *Kassap v. Seitz*, 315 Md. 155, 159 (1989). "Section 10-410(a) makes clear that in order for a plaintiff to maintain a civil action the defendant must have acted 'in violation' of the Act." *Id.* Under Section 10-410: (a) Civil liability. – "Any person whose wire, oral, or electronic communication is intercepted, disclosed, or used in violation of this subtitle shall have a civil cause of action against any person who intercepts, discloses, or uses, or procures any other person to intercept, disclose, or use the communications…" MD. CODE ANN., CTS. & JUD. PROC. § 10-410(a).

Section 10-410 makes clear that in order to demonstrate civil liability, Plaintiff must prove that her oral communication was intercepted, disclosed, or used in violation of the statute, and that Defendant is responsible for intercepting, disclosing, or using (or procuring any other person to do the same). Plaintiff maintains that she is not the individual on the recording.[5] Therefore, she has necessarily foreclosed an action under the Maryland Wiretap Act. Further, Plaintiff fails to generate any evidence that Defendant, or a person precured by Defendant, intercepted or disclosed an oral communication by Plaintiff. Accordingly, the Motion will be granted as to Count V.

## V.        Defamation (Count VI)

Defendant argues Plaintiff's defamation claim is barred by the statute of limitations.

In Maryland, "[a]n action for assault, libel or slander shall be filed within one year from the date it accrues." MD. CODE ANN., CTS. & JUD. PROC. §5-105.

Plaintiff testified in her deposition:

> Q: Now, your defamation claims are based on the fact that you think that FCPS told parents during their investigation that you said "fuck white people" to their kids, right? That's the statement?
>
> A: Yes.

---

[5] Curiously, Plaintiff's wiretap claim is pled as contingent upon a determination that the recording is of her own voice.

(ECF No. 41-5, 93:17-21.)

The communication on which Plaintiff bases her defamation claim occurred between February 14 and February 18, 2020, when FHS administrators were conducting their investigation. (ECF No. 41-1, p. 56.)   Accordingly, Plaintiff's defamation claim is time-barred, because she did not assert her claim until May 14, 2021.  Defendant is entitled to judgement as a matter of law. The Motion will be granted as to Count VI.

## CONCLUSION

For the reasons stated above, FCPS' Motion for Summary Judgment (ECF No.41) is GRANTED.

A separate Order follows.

Dated: January 12, 2023

                             __/s/_____
                             Julie R. Rubin
                             United States District Judge